IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Norfolk Southern Railway Company,          Case No. 3:21 CV 874

             Plaintiff,          <u>MEMORANDUM OPINION</u>

       -vs-          JUDGE JACK ZOUHARY

M/V Saginaw IMO 517876, et al.,

             Defendants.

### INTRODUCTION

A few minutes can make a big difference.

This case is anchored in a maritime allision on the Maumee River. The River runs from northeastern Indiana (Fort Wayne) into northwestern Ohio (Toledo) and dumps into Lake Erie. The mouth of the river is wide and supports commercial traffic -- traffic at the heart of this case. Defendant M/V Saginaw ("Saginaw"), a 639-foot vessel, struck the fender system of a railroad swing bridge. The bridge belonged to Plaintiff Norfolk Southern Railway Company ("NS"). The swing bridge rotates 90 degrees when open, allowing for two navigable channels on each side of the swing mechanism. The swing mechanism is protected by a fender system extending approximately 75 yards east and west of the center of the bridge, each with a channel 150 feet wide beneath the bridge.

The allision -- the term of art for when a moving vessel collides with a fixed object -- occurred in late April 2019 in the wee hours of the morning. The parties stipulate the repair damage to the bridge was $444,146.28. But who was at fault? Who should pay? This Court held a bench trial and reviewed briefing (Docs. 34–35). This Court has admiralty and maritime jurisdiction under Article 3, Section 2 of the United States Constitution and 28 U.S.C. § 1333.

## WHAT HAPPENED THAT NIGHT

On April 30, 2019 around 12:56 AM, the Saginaw Captain, Colin Lozon, radioed Bridge Operator John Helton. Lozon informed Helton that his vessel was "loaded with Grain with an ETA [estimated time of arrival] of 30 minutes" for the bridge (Doc. 27-1 at 1). Knowing the bridge was often delayed in opening and cautious of the elevated current conditions, Lozon explicitly indicated he "would not depart the dock until [the bridge was] actually open" (Tr. at 20[1]). Helton contacted his dispatcher for clearance and informed the dispatcher of a "30 min ETA for the outbound ship" (Doc. 27-1 at 1). The railroad dispatcher advised that the vessel could come through after an approaching train passed over the bridge. The dispatcher did not give a time estimate, but Helton estimated the train and vessel would be arriving nearly at the same time, allowing for the bridge to be opened in time for the vessel to pass (Tr. at 89–90). Helton called back Lozon and instructed him to "go ahead and do your thing" (*id.* at 20, 53). The parties disagree on whether Helton informed Lozon of the train passing before he departed. Helton testified he "responded back to either Saginaw or [the tugboat] Colorado that [he] had one more train . . . coming with an ETA of 30 minutes so his movement and the train movement looked great in so many words" (*id.* at 82). Lozon testified that he first learned of the passing train "when [he] got a visual on the bridge" (*id.* at 58).

The Saginaw departed from the Kuhlman Dock around 1:14 AM. Lozon had a view of the bridge around 1:21 AM, saw there was a train crossing it, and urgently radioed Helton. According to Lozon, Helton then informed him the bridge was clear after this train. Lozon began to start maneuvers to position his vessel in an angle that would allow him to back up the river and hold in place until the train cleared.

---

[1] The citation "Tr." refers to the unofficial transcript of the bench trial held on October 5, 2022.

Lozon had wanted to know when the bridge was opening or fully opened *before* he advanced because of a history with this bridge not opening timely; as well as the high current requiring Lozon to need the assistance of a tugboat -- the Colorado -- which he rarely, if ever, used at this location. Lozon attempted to hold the vessel as the Colorado pushed the Saginaw's stern upriver. Lozon used the bow thruster and, with tug assistance, was able to achieve backup. However, the heavy current caused the Saginaw to lose alignment with the bridge.

The timeline -- as supported by the written records, the Exhibit 19 navigation video, and the recollection of the witnesses -- indicates the bridge began opening around 1:30 AM. Lozon pulled from the dock around 1:14 AM, saw the bridge was still closed and radioed Helton at 1:21 AM. He maneuvered until he saw the bridge was fully opened at 1:34 AM, at which point he proceeded toward the bridge. Lozon knew he had lost some alignment with the bridge due to the fast current. The bridge fender on the west side consists of wood between two telephone poles, while the fender on the other side consists of rock. While attempting the passage, the vessel missed the channel and struck the west downriver side of the fender system. Although Lozon knew he was "not clear of the cells on [the] west side" (Doc. 24 at 72), he made no attempt to contact either the tugboat or the bridge operator and alert them of the misalignment.

## DISCUSSION

When an allision occurs, a *prima facie* case of fault is established against the moving vessel, and an inference of negligence arises. *The Oregon*, 158 U.S. 186, 197–203 (1895). *See also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010) ("An allision occurs when a moving vessel strikes a stationary object, and a collision occurs when two moving vessels strike each other. . . . The *Oregon Rule* applies to allisions." (citation omitted)).

3

However, the presumption against the moving vessel has been rejected by some courts when a bridge owner is in violation of a statutory rule or regulation intended to prevent allisions. *Fla. E. Coast Ry. Co. v. Revilo Corp.*, 637 F.2d 1060, 1064 (5th Cir. 1981). Under the *Pennsylvania Rule*, the shipowner must prove by a preponderance of the evidence that: (1) there was a violation of a statute or regulation imposing a mandatory duty; (2) the statute or regulation involves marine safety or navigation; and (3) the injury sustained was the type intended to be prevented by the statute or regulation. *Union Pac. R.R. Co. v. Kirby Inland Marine*, 296 F.3d 671, 674 (8th Cir. 2002) (citing *The Pennsylvania*, 86 U.S. 125, 136 (1873)). To rebut the presumption, the bridge owner must show "not only that its conduct was not a contributing cause of the collision, but that it could not have been a cause of the collision." *Fla. E. Coast Ry. Co.*, 637 F.2d at 1064 (citation omitted).

### *Presumption of Fault*

Saginaw argues NS was negligent *per se* under the *Pennsylvania Rule* because it violated 33 C.F.R. § 117.5, which requires the bridge to open "promptly and fully for the passage of vessels when a request or signal to open is given." A vessel's obligation to signal the bridge can be satisfied by "sound signals, visual signals, or radiotelephone communications . . . ." 33 C.F.R. § 117.15.

Saginaw satisfies all three elements of the *Pennsylvania Rule*. First, despite Lozon signaling via radio at 12:56 AM that he would be approaching the bridge in approximately 30 minutes, the bridge was not opened upon his arrival. This is a violation of 33 C.F.R. § 117.5, satisfying the first element of the *Pennsylvania Rule*. Second, this regulation indisputably involves marine navigation, and so the second element is met. Third, resulting damages flow directly from the bridge owner's failure to comply with the regulation. As shown in the Exhibit 19 navigational video, the captain got visual of the closed bridge only after he turned the bend in the River, upon which he had to maneuver the vessel to avoid hitting the bridge. This caused him to fall out of line with the bridge and -- despite his efforts -- hit the bridge once

it was finally open. The rebuttable presumption of fault now shifts to NS. *Union Pac. R.R. Co.*, 296 F.3d at 674.

NS does not argue that Helton's failure to have the bridge open in time could not have been a contributing cause of the allision. NS acknowledges that the bridge opened late: "[t]he bridge log records an anticipated opening at [1:30 AM] and it was open at [1:32 AM]" (Doc. 34 at 9). Trial testimony suggested the bridge was not fully open until 1:34 AM, when it arguably should have been open by 1:26 AM (Tr. at 90). Although it cannot rebut the presumption under the *Pennsylvania Rule*, NS argues that Saginaw also contributed to the cause of the allision. *See Fla. E. Coast Ry. Co.*, 637 F.2d at 1065.

Both sides agree that the initial communication between Lozon and Helton was vague. Although Lozon believed "do your thing" meant he could proceed, he did not verify, as he admittedly wanted, that the bridge was open before he left the dock. The nature and timing of their communication is not exact. Further, there was never any attempt by Lozon to notify anyone that he thought an allision could occur. Both sides share some fault here.

### *Comparative Negligence*

The evidence is disputed whether Lozon could have taken some different course of action to avoid the accident. NS argues Lozon failed to exercise the requisite standard of care to avoid striking the bridge. NS presents the "expert" testimony of Captain Daniel Hobbs. He offers two points: (1) Lozon should have confirmed the bridge was open before leaving the dock; and (2) Lozon "should have backed up even further" to straighten his stern before proceeding when the bridge fully opened. This Court finds that Lozon fell short of taking the necessary measures to confirm the bridge was open (especially given the high current), and to control his vessel to successfully maneuver and avoid the allision. Lozon was bound to act with "reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Grosse Ile Bridge Co. v. Am. S.S. Co.*, 302 F.3d 616, 624 (6th Cir. 2002) (citations

omitted). This standard can be lowered under the *in-extremis* doctrine, which states that "the decisions of a captain are to be leniently judged when his or her vessel is put in sudden peril through no fault of its own." *Id.* at 625. But Lozon shares some fault here.

Perhaps Saginaw should have confirmed the bridge was either open or opening "by radio or having the tug take a look" (Doc. 34 at 10). The record is mixed on this point. The tugboat captain testified he was unable to view the bridge from his location, and therefore he would not have been able to confirm it was open (Doc. 26 at 17). Under the "invitation to proceed" rule, Saginaw was entitled to presume the bridge would be promptly opened for its passage. *Grosse Ile Bridge Co.*, 302 F.3d at 623–24. What is promptly? Having indicated he did not want to depart until the bridge was at least opening, Lozon admitted he never received an explicit notice that the bridge was in fact open or opening, and that it was his decision "to leave the berth" at the time that he did (Tr. at 59).

Courts have found bridge operators fully responsible in some cases. In *Pennsylvania R. Co. v. The Marie Leonhardt*, the bridge failed to timely open when radioed by the oncoming vessel, causing the vessel to drop its anchor, go astern, and strike the bridge. 202 F. Supp. 368, 380 (E.D. Pa. 1962), *aff'd*, 320 F.2d 262 (3d Cir. 1963). The district court found the bridge operator fully responsible, noting that "those in charge of the bridge had an affirmative duty to open the drawspan to its fullest extent at a time sufficiently in advance of the ship's arrival so as to assure the pilot of safe passage." *Id.* at 380. But in that case, "[t]he tower operator responded that the bridge was opening," and Helton made no such explicit indication here, nor did Lozon ensure one was made. *Id.* at 372.

Also similar to this case is *State of Connecticut v. Tug Cynthia Moran*, where the vessel communicated by radio that it would be approaching the bridge in "about an hour." 607 F. Supp. 24, 26 (D. Conn. 1984). The bridge operators responded they would "be ready," but upon approach, the bridge was not open, forcing the vessel captain to maneuver and strike the bridge fendering system. *Id.* at 27.

6

The court found the bridge operator fully responsible because, upon being requested for opening, the bridge operator has a duty to either advise the captain that he could not be sure the bridge could be opened in the requested time. *Id.* at 29. *See also Nassau Cnty. Bridge Auth. v. Tug Dorothy McAllister*, 207 F. Supp. 167, 170–71 (E.D.N.Y. 1962), *aff'd*, 315 F.2d 631 (2d Cir. 1963). But in that case, the bridge operator assured *twice* that the bridge would be "going up" -- before the captain proceeded and again when the captain communicated his final approach. *State of Conn.*, 607 F. Supp. at 27. No such explicit communication occurred here even once. Furthermore, the bridge operator guesstimated the "movement of the ship versus movement of the train and the ETAs [were] pretty close" and thought it would be open in time for passage (Tr. at 94). At no point did Helton anticipate an allision, even when those on the Saginaw "knew it would be close" (Doc. 25 at 23).

### Grosse Ile

Both sides cite to *Grosse Ile Bridge Co.*, 302 F.3d 616. That case has a little something for everyone -- both sides were found to have some fault. In *Grosse Ile*, the bridge tender had been drinking on the day of the accident; the vessel lookout may have ignored a yellow flashing warning; the vessel's progress toward the drawbridge was not negligent, but the captain was negligent for failing to drop anchor. *Id.* Not our facts. Missing in our case was the radio communication between the tugboat and the bridge operator, as well as the tugboat and the vessel, including communication to counteract the vessel's reverse movement in order to keep alignment with the open bridge. *See id.* at 623–24. The parties dispute some of what exactly was said and when, but Saginaw cannot escape some responsibility for proceeding without further confirmation -- from either Helton or the tug -- that the bridge was in fact open or opening, especially considering Lozon's knowledge of the bridge's history of delayed opening and the high current that night.

NS also argues that Lozon, admittedly "in control," should have straightened the stern before advancing (Tr. at 142). When Lozon saw the bridge was open, he made the decision to advance even though he was not satisfied with the lineup of his vessel. No doubt Lozon was in a difficult situation -- between the bridge opening later than he was expecting and the elevated current -- all the more reason for him to have ensured full control of the Saginaw before proceeding toward the open bridge. *See Exxon Corp. v. Fla. E. Coast Ry. Co.*, 1979 WL 6504621, at *1 (M.D. Fla. 1979), *aff'd*, *Fla. E. Coast Ry. Co.*, 637 F.2d 1060 (finding that prudent navigation of a vessel passing beneath a bridge in flood-tide conditions mandates an even greater degree of care and control than might be necessary).

Lozon was aware the high current would make going downriver more challenging than typically expected. *See Exxon Corp.*, 1979 WL 6504621 at *1 (finding the captain negligent for not maintaining the sufficient control to maneuver and avoid the resulting collision). He was not satisfied with the lineup of the vessel with the bridge, but felt he "was pretty limited in options" (Tr. at 41). NS provided expert testimony that it was possible for the vessel to back up further and adjust before proceeding. This Court finds Saginaw could have done more in acting reasonably prudent -- to further back up and better align his approach, or at least alert Helton or the tugboat captain for assistance regarding the seemingly expected allision.

### *Amount of Recovery*

When two or more parties have contributed by their fault to cause property damages in a maritime accident, liability for such damages is to be allocated among the parties proportionately to the comparative degree of the fault. *States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975). Apportionment is a fact-specific inquiry. *Grosse Ile Bridge Co. v. Am. S.S. Co.*, 2006 WL 680855, at *2 (E.D. Mich. 2006).

In evaluating the "quality of the faults," and the weight or significance of the fault in causing the casualty, this Court assesses fault against Saginaw at 25%, thereby awarding NS $111,036.57, plus

prejudgment interest from the allision date to the judgment date. *Id. See City of Milwaukee v. Cement Division, Nat'l Gypsum Co.*, 515 U.S. 189, 194–95 (1995). "Prejudgment interest is to be calculated at the prime rate, compounded annually." *Grosse Ile Bridge*, 2006 WL 680855 at *7.

## CONCLUSION

The Maumee River (sometimes known as the "Muddy Maumee") creates some difficult maneuvering during spring when the tide is high. Boaters beware. In the words of the captain from *Cool Hand Luke* -- "What we've got here is a failure to communicate." Both sides could have done a better job to avoid this allision. This Court enters final judgment for NS in the amount of $111,036.57, plus pre-judgment interest at the applicable prime rate from April 30, 2019 until paid in full.

IT IS SO ORDERED.

                                                 *s/ Jack Zouhary*
                                                 JACK ZOUHARY
                                                 U.S. DISTRICT JUDGE

                                                 March 31, 2023